**CERTIFIED COPY**

# In the
# United States Court of Appeals
## For the Seventh Circuit

FILED
AUG 1 1 2005
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

RECEIVED
AUG 1 1 2005
Plaintiff-Appellee OFFICE
URBANA, IL

No. 04-2015

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee,*

*v.*

CEDRIC WASHINGTON,

                *Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 03 CR 20045—**Michael P. McCuskey**, *Chief Judge.*

ARGUED APRIL 6, 2005—DECIDED AUGUST 9, 2005

Before BAUER, RIPPLE, and WOOD, *Circuit Judges.*

BAUER, *Circuit Judge.* In December 2003, a grand jury returned a two-count superseding indictment against Cedric Washington for crack distribution in Champaign, Illinois. Washington was convicted on both counts and the district court sentenced him to 420 months' imprisonment. On appeal, Washington asserts that his conviction must be reversed due to judicial bias and improper argument by the prosecutor. Washington also challenges his sentence on the basis of *United States v. Booker*, 125 S.Ct. 738 (2005).

2                                                                  No. 04-2015

For the reasons that follow, we affirm Washington's conviction and order a limited remand on his sentence pursuant to the procedure outlined in *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

## I. Background

Rebecca Fullerton, who testified for the government at Washington's trial, lived in an apartment on Washington Street in Champaign with her boyfriend Asano Williams ("Meechie") during the time in question. Fullerton testified that Washington began staying with her and Meechie during March 2003, and that Washington distributed crack cocaine from the apartment. Both Fullerton and Meechie sold drugs for Washington.

Anthony Dysart and Daryle Washington,[1] also government witnesses at the trial, were police informants who made controlled buys from Washington. Around the time that Washington started staying with Fullerton, local police officers arranged for Dysart to make a controlled buy from the apartment next door to Fullerton's apartment. The apartment's occupants told Dysart to go next door to Fullerton's apartment to buy drugs. Dysart followed the instructions and purchased .5 grams of crack from Washington. The transaction was not recorded or charged in the superseding indictment.

The police then arranged for Daryle to make two controlled buys from Washington at Fullerton's apartment. On both occasions, the police provided Daryle with money and outfitted him with a video recording device. On the first occasion, April 9, 2003, Daryle entered the apartment and

---

[1] Daryle Washington and defendant Cedric Washington are not related. To avoid confusion, we will refer to Daryle Washington as Daryle.

No. 04-2015 3

purchased 10.6 grams of crack from Washington. On the second occasion, April 17, 2003, Daryle met with Washington in Fullerton's apartment and then waited while Washington retrieved the drugs from another location. Washington promptly returned and sold Daryle 3.2 grams of crack for $100.

Champaign police officers arrested Washington on April 29, 2003. He had over $500 in his possession. After Washington waived his rights, the officers advised him that they knew that he was distributing crack cocaine and that they had conducted controlled purchases from him. Washington responded by nodding his head.

On December 3, 2003, a grand jury returned a superseding indictment charging Washington with distribution of five or more grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and distribution of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). The two counts related to the two controlled buys that Daryle made from Washington. A jury convicted him on both counts after a two-day trial. At sentencing, the district court concluded that Washington was a career offender under U.S.S.G. § 4B1.1. After determining that his offense level under § 4B1.1 was 37, his criminal history category was VI, and the resulting sentencing range was 360 months to life imprisonment, the district court sentenced Washington to 420 months' imprisonment. Washington timely appealed.

## II. Discussion

### A. Judicial Bias

Washington's first argument is that the district court improperly used its inquiry power during the two-day trial to bolster the credibility of prosecution witnesses. Washington takes issue with exchanges between the district judge and Fullerton, Daryle, and Dysart. According to

Washington, the judge's questions to those witnesses conveyed a protective, reassuring, benevolent disposition towards them and the prosecution's theory of the case. This favoritism, Washington asserts, created a tag-team effect between the judge and prosecution that could not have been lost on the jury. In response, the government argues that the district court's questions did not convey a bias in favor of the government or cause Washington any prejudice. We agree with the government.

Federal judges have wide discretion to determine the role that they will play during the course of a trial. *United States v. Verser*, 916 F.2d 1268, 1272 (7th Cir. 1990) (citation omitted). A district judge is free to interject during a direct or cross-examination to clarify an issue, to require an attorney to lay a foundation, or to encourage an examining attorney to get to the point. FED. R. EVID. 614(b); *United States v. Reynolds*, 189 F.3d 521, 528 (7th Cir. 1999). The judge may also choose to play a more passive role when the case calls for it. But in exercising his discretion regarding when to intercede and when to cede the floor to the attorneys, the judge must refrain from "assum[ing] the role of an advocate for either side." *United States v. Martin*, 189 F.3d 547, 553 (7th Cir. 1999) (citation omitted). If a party claims that a trial judge crossed the line and displayed partiality towards the other side, we analyze the issue pursuant to a two-step inquiry. *Id.* First, we inquire whether the judge in fact conveyed a bias regarding the defendant's honesty or guilt. *Id.* If so, we consider whether the complaining party has shown serious prejudice resulting from the district court's comments or questions. *Id.*

We begin with the challenged exchange between Fullerton and the district judge, which took place during the government's re-direct examination:

> Court: Ms. Fullerton, when you came into this courtroom this morning—have you ever testified in court before?

No. 04-2015  5

| | |
|---|---|
| Witness: | No. |
| Court: | And when you raised your hand and you took the oath from the clerk, what did that mean to you? |
| Witness: | What did it mean to me? |
| Court: | Yes. |
| Witness: | The truth, to tell the truth. |
| Court: | And you're not concerned about anything but telling the truth? |
| Witness: | Yes. |
| Court: | Whether that makes the police officers happy or not is irrelevant; your job is to tell the truth? |
| Witness: | Yes. |

Tr. 293-94. Washington views the foregoing questioning as the judge's attempt to rehabilitate Fullerton after his attorney's cross-examination of her.

As an initial matter, we acknowledge that it is difficult for an appellate court, working only with the cold record, to read words in a transcript and decide whether they unfairly build up a government witness or disparage the defendant. We cannot recreate the judge's or the witness's intonations or body language, nor can we assess exactly how the jury reacted to the witness on the stand. That said, we see no problem with the judge's questioning of Fullerton because there are numerous innocuous explanations for the judge's interruption. Indeed, the effect of the questioning, if any, may have actually cut the other way. Reminding a witness that she is under oath and exploring what that means is a tack used on cross-examination as often or more often than it is used on re-direct. In other words, jurors could have seen the district judge's question-

6                                                    No. 04-2015

ing as a challenge to Fullerton's credibility and a warning not to lie rather than rehabilitation. Or, as was suggested at oral argument, perhaps the judge was warning the government not to suborn perjury. Regardless of the judge's intentions, the issue was clearly collateral, we doubt that it had an appreciable impact on the jury, and we are confident that it did not cause Washington any prejudice. We accordingly reject Washington's judicial bias claim as it relates to the judge's exchange with Fullerton.

Washington's challenge to the district judge's questioning of Daryle also lacks merit. Washington objects to the judge's interruption of defense counsel's cross-examination of Daryle to engage in a "frivolous discussion" about his watch. But this discussion stemmed from the judge's desire to clarify for the jury that it was Daryle's watch that was briefly blocking the camera during the video recording of one of his controlled buys from Washington; it is the judge's prerogative to interject to clarify an issue that may cause jury confusion. *Martin*, 189 F.3d at 553. We conclude that this discussion did not convey judicial bias.

Washington's final beef with the district judge centers on an exchange with Dysart about his military service:

| | |
|---|---|
| Def. Counsel: | So, in order to make sure that your life is safe, lying and deceiving is [sic] very important. |
| Witness: | I learned that in the military. |
| Court: | What did you say? |
| Witness: | I learned that in the military. |
| Court: | You were in the military. |
| Witness: | Yes, sir. |
| Court: | What branch? |
| Witness: | Army. |

No. 04-2015                                                                 7

| | |
|---|---|
| Court: | When? |
| Witness: | 1 October '74 to 22 April '81. |
| Court: | You were in the military for more than ten years? |
| Witness: | I was in there for about seven and a half years. |
| Court: | Seven and a half years. And were you honorably discharged? |
| Witness: | Yes, sir. |
| Court: | What rank did you have when you left? |
| Witness: | I was E4—I was E5, but I got let down to E4. |
| Court: | Thank you. |

Tr. 326-27. Washington characterizes this interruption and questioning as unvarnished judicial favoritism in that the judge cut off defense counsel's cross-examination at a crucial point to delve into a completely irrelevant area. Washington also criticizes the judge for bolstering Dysart's credibility by asking about his military service and then immediately cutting off questioning when Dysart mentioned the reduction in rank.

We think Washington's criticism is misplaced. Defense counsel was cross-examining Dysart on the lies and deceit necessary in the life of a government informant when Dysart made an odd comment—that he learned about lying and deceiving in the military. This remark probably merited the judge's intervention, at least to clarify the cryptic statement for the jury. Even if it could be said that the judge's follow-up questions about Dysart's rank, branch, and time of service were not entirely necessary, it does not follow that they conveyed judicial bias or that they prejudiced Washington. As we have noted in prior cases, a

8                                                                           No. 04-2015

district judge's comments must be evaluated in the context of the trial. *Verser*, 916 F.2d at 1273. In this case, the district judge was relatively active in questioning the witnesses, regardless of whether it was the prosecutor's or defense counsel's examination. For example, though Washington only objects to one exchange between the judge and Dysart, the judge also asked Dysart questions during the prosecutor's direct examination, Tr. 306, after the prosecutor's direct examination but before defense counsel's cross-examination, Tr. 312-14, and then another time during defense counsel's cross-examination of Dysart prior to the inquiry about his military service. Tr. 321. Not only was the judge even-handed in terms of when he chose to make his inquiries, the topics covered by the questioning—the amount Dysart was being paid for his testimony, the code used by local drug dealers, Dysart's military service—also suggest impartiality and indicate that he was simply trying to get the facts out for the jury. Moreover, Dysart did not provide direct testimony about the crimes charged, which makes it difficult for Washington to argue that he was seriously prejudiced by the exchange. The potential for prejudice was further reduced by the district court's instruction at the close of the case that nothing it did or said was meant to reflect any opinion on its part about the facts or what the verdict should be. *United States v. Evans*, 994 F.2d 317, 324 (7th Cir. 1993). For all of these reasons, we decline to reverse Washington's conviction on the basis of the judge's discussion with Dysart.

### B. Prosecution's Rebuttal Argument

Washington next challenges the propriety of the prosecutor's rebuttal argument. According to Washington, the prosecutor's rebuttal was profoundly unprofessional and prejudicial in that it was directed at defense counsel personally and accused her (inaccurately) of completely misrepresenting

No. 04-2015                                                                 9

the evidence to the jury. Washington insists that the improper argument rendered his trial fundamentally unfair. Because Washington did not object to the prosecutor's rebuttal at trial, we review under the deferential plain error standard.

Claims of prosecutorial misconduct are analyzed under the framework established by the Supreme Court in *Darden v. Wainwright*, 477 U.S. 168 (1986). Under *Darden*, we first consider whether the prosecutor's comments were improper. *Id.* at 180-81. If the comments were improper, we must decide whether they prejudiced the defendant. *Id.* Six factors guide the prejudice inquiry: "(1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused, (3) whether the defense invited the response, (4) the trial court's instructions, (5) the weight of the evidence against the defendant, and (6) the defendant's opportunity to rebut." *Howard v. Gramley*, 225 F.3d 784, 793 (7th Cir. 2000). The *Darden* Court emphasized that it "is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (internal quotations and citations omitted). With this deferential standard in mind, we turn to the specifics of the claim in the instant case.

This was a hard-hitting rebuttal argument by the prosecutor, full of harsh criticism of the defendant's theory of the case. The prosecutor started with this comment:

> Ladies and gentlemen, I don't intend to respond to much of that nonsense. You've heard enough from the lawyers, and it's time for this defendant to be judged; but there were so many misrepresentations of the evidence that some response is necessary.

10                                          No. 04-2015

Tr. 666-67. The prosecutor went on to characterize the majority of the defense arguments as "made up," "absolutely false," "ridiculous," or "ludicrous." For example, the prosecutor argued in closing that the April 9 videotape showed Daryle making a controlled buy from Washington. In her summation, defense counsel suggested that the videotape of the first buy showed Meechie retrieving drugs from his mouth for Daryle. In rebuttal, the prosecutor called this theory "just absolutely ludicrous." Tr. 668. With regard to the second buy, defense counsel argued that Daryle got the drugs from a man who was seen on the videotape sitting on the steps in Washington's apartment complex as Daryle walked up to Washington's apartment. That argument, according to the prosecutor, was "just completely made up." Tr. 669. Similar remarks were made throughout the rebuttal.

We think that the rebuttal could have been more artful and that some of the comments pushed the bounds of zealous advocacy. While it was surely appropriate for the prosecutor to emphatically rebut defense counsel's arguments, the overall tone of the rebuttal was probably overly strident. Nonetheless, contrary to Washington's contention, the prosecutor's arguments were largely focused on the lameness of the defense rather than defense counsel personally. In addition, a review of the record, including the videotape recordings, illustrates that the theory of the defense was rather weak. The jury apparently did not buy the defense, and the district judge was also unimpressed—in a post-trial ruling, he called the defense "a very creative version of the facts with little support in the evidence." None of this, of course, is a reflection on defense counsel; "counsel represent many people with lame defenses," *United States v. Sblendorio*, 830 F.2d 1382, 1395 (7th Cir. 1987), and it is an attorney's duty to zealously advocate for her client even in the face of difficult facts. Though the defense theory may not have been the most likely course

of events, we think that the defense attorney did a fine job with the hand she was dealt.

The prosecutor had legitimate grounds for some of his comments, and a more questionable basis for others. One argument made by the prosecutor was that Daryle walked right past the man on the stairs on April 17 and had no opportunity to get drugs from him. In her closing, defense counsel submitted that the videotapes were not in real time so that what looked like a few seconds on the video may actually have been longer. This argument was a stretch with little evidentiary support and the prosecutor probably did not overstate it in saying that the representation was "plainly false." On the other hand, the prosecutor called defense counsel's representation that Daryle was getting paid over $1,000 for his work "just absolutely false" because he was being paid $200. Actually, the representation was not false because the lawyers appear to have been talking about different things: the defense attorney was referencing the total amount Daryle was paid for his assistance with various cases while the prosecutor focused on the amount Daryle was paid for his work on Cedric Washington's case. It was also questionable for the prosecutor to assert during rebuttal that Dysart and Daryle would not risk their positions as informants and their freedom by committing perjury to convict Washington. *Cf. United States v. Johnson-Dix*, 54 F.3d 1295, 1304-05 (7th Cir. 1995) (noting that it is improper for prosecutor to vouch for government agent by speculating that he would not risk his career by testifying falsely).

But even accepting that some of the prosecutor's comments were improper, the prosecutorial misconduct claim fails at the prejudice stage. Though Washington did not have a chance to rebut and that weighs in his favor, the remaining factors all weigh heavily against him. The prosecutor did not misstate the evidence or implicate specific rights of the accused. Moreover, the trial court instructed

the jury that the arguments of counsel are not evidence, which mitigates the potential that the jury relied on improper argument by counsel. *United States v. Andreas*, 216 F.3d 645, 675 (7th Cir. 2000). Finally, like most prosecutorial misconduct claims, Washington's claim founders in the face of the strong evidence of his guilt. Tape recordings, whether video or audio, are powerful evidence of guilt, and the government introduced videotapes of the two drug transactions described in the indictment. The tapes were corroborated by the testimony of Daryle and the testimony of the government agents that conducted the sting. Fullerton and Dysart confirmed that Washington was a crack dealer in Champaign. Washington, who was the only defense witness, took the stand, admitted that it was him on the tape, that he was familiar with crack, and that the videotape showed drug transactions, but denied actually selling crack to Daryle. His improbable story was that Meechie retrieved crack cocaine from his mouth to sell to Daryle on one occasion, and that Daryle actually sold crack to him on the other occasion. Both scenarios are difficult to square with the videotape recording and the testimony of the other witnesses. The jury returned with a conviction on both counts after only 34 minutes of deliberation. The overwhelming evidence of guilt in this case eliminates any lingering doubt that improper comments by the prosecutor prejudiced Washington.

### C. Sentencing

Washington's 420-month sentence was driven by the district court's determination that prior convictions for crimes of violence and controlled substance offenses qualified him as a career offender under U.S.S.G. § 4B1.1. Washington objects to his sentence on the basis of the Sixth Amendment principles explained in *United States v. Booker*, 125 S.Ct. 738 (2005) and its precursors. According

to Washington, the judge erred by making a series of factual findings at sentencing that enhanced his sentence beyond what he admitted or the jury found. He maintains that his conviction only supported a base offense level of 26, 11 levels below where the judge ultimately sentenced him. Washington forfeited this argument by not bringing it to the district judge's attention at sentencing. Consequently, we may correct an error only if Washington demonstrates that it was plain error under Rule 52(b) of the Federal Rules of Criminal Procedure. *United States v. Olano*, 507 U.S. 725, 734-35 (1993).

Washington's argument ignores the Supreme Court's holding in *Almendarez-Torres v. United States*, 523 U.S. 224 (1998) that prior convictions need not be proven to a jury beyond a reasonable doubt, a holding that was left undisturbed by *Booker*. *Booker*, 125 S.Ct. at 756 ("Any fact (*other than a prior conviction*) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.") (emphasis added). Nor is the Supreme Court's recent decision in *Shepard* of any assistance to Washington because he admitted at sentencing that he and his attorney had reviewed and discussed his presentence report, which recommended sentencing him as a career offender, and had no objections. Sentencing Tr. 685-87; *United States v. Shepard*, 125 S.Ct. 1254 (2005) (limiting the sources that sentencing judges can consider when considering issues related to prior convictions). Nonetheless, as the government conceded at oral argument, Washington is entitled to a limited remand pursuant to the procedure explained in *Paladino* because "the mere mandatory application of the Guidelines—the district court's belief that it was required to impose a Guidelines sentence—constitutes error." *United States v. White*, 406 F.3d 827, 835 (7th Cir. 2005). We will vacate and remand the case

for resentencing if the judge states that he would have given Washington a different sentence had he known that the guidelines were advisory. *Id.* If, on the other hand, the judge states that he would reimpose the same sentence even under an advisory sentencing regime, we will affirm the original sentence provided that it is reasonable. *Id.*

### III. Conclusion

For the reasons stated herein, we AFFIRM Washington's conviction and order a LIMITED REMAND with respect to his sentence.

A true Copy:

Teste:

_____
Clerk of the United States Court of
Appeals for the Seventh Circuit